# Third District Court of Appeal

## State of Florida

Opinion filed May 27, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-405
Lower Tribunal No. 12-47448

_____

**Bruce Matheson,**
Appellant,

vs.

**Miami-Dade County, Florida, a political Subdivision of the State of Florida, and International Players Championship, Inc.,**
Appellees.


An Appeal from the Circuit Court for Miami-Dade County, Marc Schumacher, Judge.

Carlton Fields Jorden Burt, Richard J. Ovelmen, Enrique D. Arana and Jason P. Kairalla, for appellant.

Stearns Weaver Miller Weissler Alhadeff & Sitterson, Eugene E. Stearns, Joshua A. Munn and Joseph J. Onorati; R.A. Cuevas, Jr., Miami-Dade County Attorney, Oren Rosenthal, Monica Rizo and Miguel A. Gonzalez, for appellees.

Before WELLS, EMAS and FERNANDEZ, JJ.

FERNANDEZ, J.

Bruce C. Matheson appeals the final judgment entered by the trial court in

favor of Miami-Dade County and International Players Championship, Inc. and

against Matheson on all counts. We affirm the final judgment on all counts because the trial court's finding that the "chief purpose" of the referendum was properly provided to Miami-Dade County voters by the title and ballot summary is correct.

In 1986, Miami-Dade County and International Players Championship, Inc. (IPC) entered into an agreement for IPC to operate a men's and women's professional tennis tournament from the Crandon Park Tennis Center in Crandon Park, Key Biscayne, Florida. The IPC Agreement conducts what is today the Miami Open. At the time, it was the Lipton International Players Championship Tennis Tournament. The Agreement was amended in 1988 and 1990 and remains in effect through 2023.

In 1988, heirs of Malcom and Julia Matheson sued the County, alleging, among other things, that the IPC Agreement violated a deed restriction that required the County to use Crandon Park "for public park purposes only." White v. Metro. Dade Cnty, 563 So. 2d 117, 120 (Fla. 3d DCA 1990). In White, this Court held that "construction of the tennis complex did not violate the 'public park purposes only' provision of the deed restriction." Id. at 123-24.[1]

---

[1] This Court did hold, however, that the operation of the Lipton tournament violated the deed restriction because it deprived the public "of the use and enjoyment of Crandon Park, including the use and enjoyment of the tennis facilities." Id. at 124. This Court reasoned that because the public is deprived of using the facilities for three to four weeks during the tournament period, the operation of the Lipton tournament amounted "to the virtual ouster of the public from the park" during the tournament. White, 563 So.2d at 125.

2

In 1991, the Matheson heirs filed a second lawsuit in <u>Dade County v.</u> <u>Matheson</u>, 605 So. 2d 469 (Fla. 3d DCA 1992), trying to again prohibit the construction of the tennis stadium at Crandon Park. <u>Id.</u> at 470. This Court agreed with the County and held that the issue of whether or not a stadium may be built as part of the tennis complex had already been decided by this Court in <u>White</u>. Thus, the Matheson heirs were not permitted to re-litigate the County's ability to build the tennis stadium in the tennis complex. <u>Id.</u>

Thereafter, in order to resolve the litigation, the County and the Matheson heirs entered into a Settlement Agreement in 1993. This Settlement Agreement ordered the creation of the Crandon Park Master Plan, "depicting all permitted uses of various areas on the Crandon Park lands, including guidelines and standards for the type, location, size, color, landscaping and other features of all structures, improvements and recreational facilities to be located" on the Crandon Park lands. The Master Plan is contained in the Amended Final Judgment in <u>Malcom</u> <u>Matheson, Jr. v. Metropolitan Dade County</u>, No. 88-24491 (Fla. 11th Cir. Ct. Oct. 18, 2000). It was also recorded as a restrictive covenant running with the land, in the public records of Miami-Dade County.

This Master Plan, however, is not fixed but rather is amenable to modification. The Settlement Agreement entered into by the Matheson heirs and

the County provided for ways to amend the Crandon Park Master Plan. The Settlement Agreement stated, in part:

> The Crandon Park Master Plan as implemented by the above mentioned Declaration of Restrictions and Final Judgment, may be amended following adoption only by the following procedure: (1) the County by affirmative vote of the County Board of Commissioners shall propose an amendment through action by resolution; (2) the County shall appoint two persons to a Committee on Amendment of the Crandon Park Master Plan, and the National Parks and Conversation Association (or a successor non-profit park preservation organization mutually agreed upon by the Parties) shall likewise appoint two members to such Committee on Amendment of the Crandon Park Master Plan….

In addition, the Amended Final Judgment in case no. 88-24491, Malcom Matheson, Jr. v. Metropolitan Dade County, reflects that the Master Plan can be changed. The Declaration of Restrictive Covenants also states that amending the Master Plan is possible.[2]

---

[2] There is evidence in the record that the Master Plan has been previously amended. In December 2013, the Director of the Miami-Dade Parks, Recreation and Open Spaces Department at the time, Mr. Jack Kardys, stated in his affidavit that the Master Plan has been amended several times over the years, including with respect to the Crandon Park Tennis Center. The following is a list of the amendments he listed in his affidavit: 1) On October 22, 2002, the BOCC approved an amendment to the Master Plan to allow the temporary seating for the Sony Open Tennis Tournament to be stored on the upper deck of the Tennis Stadium at Crandon Park; This amendment was approved by the Amendment Committee on November 12, 2002; 2) On October 22, 2002, the BOCC approved an amendment to the Master Plan to allow the already existing lighted ball fields to remain at Crandon Park permanently rather than being removed by January 1, 2005, as specified in the Master Plan. On May 4, 2005, the Amendment Committee approved the amendment to allow the lighted ball fields to remain beyond 2005 but

Section 7.02, "Restrictions and Exceptions," of Article 7 of the Miami-Dade County Home Rule Charter – "PARKS, AQUATIC PRESERVES, AND PRESERVATION LANDS," states in pertinent part:

> In furtherance of this policy parks shall be used for public park purposes only, and subject to the limited exceptions set forth in this Article, there shall be no permanent structures or private commercial advertising erected in a public park or private commercial use of a public park or renewals, expansions, or extensions of existing leases, licenses, or concessions to private parties of public park property, unless each such structure, lease, license, renewal, expansion, extension, concession or use shall be approved by a majority vote of the voters in a county-wide referendum.

In addition, section 101.161(1), Florida Statutes (2012), states:

---

for only an additional eight years, or until 2013; 3) On October 22, 2002, the BOCC approved an amendment to the Master Plan to allow existing boat dry storage facility at the Crandon Park Marina for 130 boats to remain instead of being reduced to 20 boats, as required by the Master Plan. On November 12, 2002, the Amendment Committee approved the amendment; 4) On December 16, 2003, the BOCC approved an amendment to the Master Plan to allow the construction of a marina dive shop larger than that permitted by the Master Plan and to allow additional uses for that marina dive shop beyond those permitted by the Master Plan. On December 7, 2004, the Amendment Committee approved the amendments to the Master Plan to allow expanded size and uses of the marina dive shop; 5) On April 5, 2005, the BOCC approved an amendment to the Master Plan to allow the expansion and modifications of utilities infrastructures at Crandon Park to account for increased demand and technological upgrades. On February 15, 2007, the Amendment Committee approved the expansion and modifications of utilities infrastructure sought by Bellsouth; 6) On March 15, 2011, the BOCC approved an amendment to the Master Plan to eliminate restrictions on the exit and traffic circulation at the Crandon Park Marina and to allow a permanent awning to replace the fabric awning at the marina. The Amendment Committee approved this amendment on May 4, 2011.

(1) Whenever a constitutional amendment or other public measure is submitted to the vote of the people, a ballot summary of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates, followed by the word "yes" and also by the word "no," and shall be styled in such a manner that a "yes" vote will indicate approval of the proposal and a "no" vote will indicate rejection. The ballot summary of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the constitutional revision commission proposal, constitutional convention proposal, taxation and budget reform commission proposal, or enabling resolution or ordinance. The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. In addition, for every amendment proposed by initiative, the ballot shall include, following the ballot summary, a separate financial impact statement concerning the measure prepared by the Financial Impact Estimating Conference in accordance with s. 100.371(5). The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of. This subsection does not apply to constitutional amendments or revisions proposed by joint resolution.

Crandon Park is one of the listed parks in Article 7, which requires an affirmative vote of two-thirds of the electorate of Miami-Dade County before any development can occur there.

Consequently, on August 23, 2012, the Miami-Dade County Board of Commissioners adopted Resolution R-660-12, which scheduled for November 6,

6

2012, a county-wide referendum election, asking voters if they approved construction of new permanent facilities within the Crandon Park Tennis Center. The referendum also asked voters if they approved modification of existing contractual relationships between Miami-Dade County and IPC. Specifically, the title and wording of the ballot were the following:

**Referendum Regarding Structures and Modification
of Existing Agreements for the Tennis Center at
Crandon Park**

In accordance with Article 7 of the Home Rule Charter, do you approve as set forth in Resolution R-660-12:

Erection of permanent structures and expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use, which shall be funded solely by tennis center and tournament revenues and private funds; and

Modification and extension of agreements with operator of Sony Open Tennis Tournament or its successors?

Resolution R-660-12 included two exhibits – Exhibit A, describing "The Proposed Additional Permanent Structures," and Exhibit B, describing the "Proposed Terms for the Extension and Modification of the Existing Agreements for Use of the Crandon Park Tennis Center for the Sony Open." Exhibit A described and limited the dimension and scope of the proposed permanent structure in great detail. In addition, Exhibit B provided the material terms for extending and modifying the

7

existing agreements between Miami-Dade County and IPC. Seventy-two percent of the voters approved the referendum.

Bruce C. Matheson then brought suit against Miami-Dade County to declare the referendum unlawful. IPC moved to intervene, and the trial court allowed the intervention. In his complaint, Matheson alleged three counts: 1) that the referendum "flew under false colors" and "hid the ball," in violation of section 101.161(1) because it did not disclose that the expansion was prohibited by the Settlement Agreement, the Master Plan and the Declaration of Restrictive Covenants, and because it could not be implemented without approval of the Amendment Committee and a vote of the Board of County Commissioners (BOCC); 2) that the proposal was non-binding and thus violated Article 7 of the Home Rule Charter; and 3) that the ballot title and summary failed to disclose facts and thus violated the "Truth in Government" provision of the County Charter and that Miami-Dade County Mayor Carlos Gimenez violated the same provision by stating that the improvements would be paid for with private funds.

Matheson eventually moved for summary judgment. Following the BOCC's approval of the agreements, the County and IPC also moved for summary judgment. The trial court denied Matheson's motion and granted summary judgment against Matheson on all three counts of his complaint. On appeal,

Matheson contends that the ballot language fails the requirements of section 101.161(1) by "hiding the ball" and "flying under false colors."

The standard of review of a trial court's ruling on a summary judgment motion is de novo. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000). However, with regard to the ballot question at issue in this appeal, this Court should invalidate it "only if the record shows that the [ballot language] is clearly and conclusively defective." Armstrong v. Harris, 773 So. 2d 7, 11 (Fla. 2000).

Section 101.161(1) requires that the substance of the public measure be printed in "clear and unambiguous" language on the ballot. According to City of Miami v. Staats, 919 So. 2d 485, 488 (Fla. 3d DCA 2005), "[t]he purpose of this requirement is to provide the voter with fair notice of the content of the proposed measure so that he or she will not be misled as to its purpose and may intelligently cast his or her vote." See also Askew v. Firestone, 421 So. 2d 151, 155 (Fla. 1982) ("the ballot must give the voter fair notice of the decision he must make"). Section 101.161(1) requires that the County and IPC explain to voters, in a summary not exceeding seventy-five words, the "chief purpose of the measure." Florida law makes it clear that the ballot question does not have to "explain every detail or ramification of the proposed amendment." City of Riviera Beach v. Riviera Beach Citizens Task Force, 87 So. 3d 18 (Fla. 4th DCA 2012) (quoting Fla. Educ. Ass'n

9

v. Fla. Dep't of State, 48 So. 3d 694, 700 (Fla. 2012)).  It only must describe its chief purpose. Id.;  see also Let Miami Beach Decide v. City of Miami Beach, 120 So. 3d 1282 (Fla. 3d DCA 2013).

Matheson contends on appeal that the ballot did not contain sufficient details. However, there is no requirement that all the details of a proposal must be explained to voters.  Florida courts have previously held that section 101.161(1) does not require excessive detail. See Miami Dolphins, Ltd. v. Metro. Dade Cnty, 394 So. 2d 981, 987 (Fla. 1981); Miami Heat Ltd. P'ship v. Leahy, 682 So. 2d 198, 203 (Fla. 3d DCA 1996).

Matheson further alleges that the County and IPC "hid the ball" regarding the proposal's chief purpose.  However, this is inaccurate. As previously discussed, the Crandon Park Tennis Center improvements hinge on several approvals. As the County contends, it would be impossible for it to present any question listing all the required development approvals that were needed within the seventy-five word limit required by section 101.161(1). This is why the ballot questions referenced Resolution R-660-12, which contained all the details.

The referendum advised voters that their approval was being sought, in accordance with Article 7 of Miami-Dade County's Home Rule Charter, to permit IPC to build additional permanent structures at the Tennis Center and to allow extension and modification of the agreement with IPC.  The ballot question gave

10

voters the material terms of the proposed additional permanent structures and the material terms of the extension and modification of the IPC Agreement. As such, the County and IPC are correct that the "chief purpose" of the Tennis Center Referendum was communicated. This "chief purpose" was to find out if at least two-thirds of the electorate in Miami-Dade County supported 1) the "erection of permanent structures and the expansion of existing structures at the Crandon Park Tennis Center for public park and tennis tournament use, which shall be funded sole by tennis center and tournament revenues and private funds," and 2) the "modification and extension of agreements with the operators of the Sony Open Tennis Tournament or its successors." Because the chief purpose of the referendum did not alter or change procedures for amending the Crandon Park Master Plan, the referendum did not violate section 101.161(1). Even after the referendum passed with two-thirds of the electorate voting in its favor, the process for obtaining the remaining required approvals remained the same.

Three approvals are needed in order to make changes to the Master Plan: 1) voter approval via referendum; 2) the County Board of Commissioner's approval; and 3) the Committee on Amendment's approval. Nowhere in the record does it specify in which order these approvals need to be obtained, and that is because there is no requirement that these approvals be obtained in any particular order. It just so happens that, in this case, compliance with Article 7 was the first step taken

by Miami-Dade County and IPC. This was not merely a "straw ballot," as Matheson suggests because the County and IPC were required under Florida law in Article 7 of the Home Rule Charter to present this issue to the voters. Because Crandon Park is one of the listed parks in Article 7, it requires an affirmative vote of two-thirds of the electorate of Miami-Dade County before any development can occur there. The only way to get this affirmative vote was to put it on a ballot for the voters to vote.

In support of his position, Matheson cites to <u>Askew v. Firestone</u>, 421 So. 2d 151 (Fla. 1982); however this case is inapplicable here. In <u>Askew</u>, the trial court entered an order validating the caption and summary of a proposed constitutional amendment scheduled to appear on the November 1982 general election ballot. <u>Id.</u> at 152. Previously, in the November 1976 general election, Florida voters approved adding section 8, the "Sunshine Amendment," to Article II of Florida's Constitution. <u>Id.</u> Section 8 declared a public office a public trust which should be secure against abuse. As a result, section 8 required full, public financial disclosure by elected officers and candidates for elected offices, provided for loss of pension or retirement benefits if a public officer or employee is convicted of a felonious breach of the public trust, and prohibited members of the legislature and statewide elected officers from lobbying their former governmental bodies or agencies for two years following vacation of office. <u>Id.</u> at 153.

12

On the next to last day of the 1982 regular session, the legislature passed Senate Joint Resolution 1035. Id. The title read: "A joint resolution proposing an amendment to Section 8 of Article II of the State Constitution relating to lobbying by former legislators and statewide elected officers." Id. The proposed amendment would remove the two-year ban on lobbying by former legislators and elected officers, retaining that ban only if an affected person failed to make financial disclosure. The title and substance proposed was the following:

**FINANCIAL DISCLOSURE REQUIRED BEFORE LOBBYING BY FORMER LEGISLATORS AND STATEWIDE ELECTED OFFICERS**

> Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests.

Id.

The appellants sued the Secretary of State to prevent inclusion of the proposed title and substance on the November ballot. Appellants claimed the title and substance were misleading under section 101.161 because, among other things, "the instant summary discloses only the proposed addition of financial disclosure as a condition to after-term lobbying and fails to reveal that the proposal would repeal the existing, more stringent after-term prohibition on lobbying." Askew, 421

13

So. 2d at 154. The trial court found that the language was clear and unambiguous of the chief purpose of the measure. The Florida Supreme Court disagreed.

The Florida Supreme Court stated: "The requirement for proposed constitutional amendment ballots is the same as for all ballots, i.e., 'that the voter should not be misled and that he have an opportunity to know and be on notice as to the proposition on which he is to cast his vote . . . . All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide . . . . What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.' " Askew, 421 So. 2d at 155 (quoting Hill v. Milander, 72 So. 2d 796, 798 (Fla. 1954)). The Court further stated, "Simply put, the ballot must give the voter fair notice of the decision he must make." Id. The Court added:

> As it stands, subsection 8(e) precludes lobbying a former body or agency for two years after an affected person leaves office. The ballot summary neglects to advise the public that there is presently a complete two-year ban on lobbying before one's agency and, while it does require the filing of financial disclosure before anyone may appear before *any* agency for the two years after leaving office, the amendment's chief effect is to abolish the present two-year total prohibition. Although the summary indicates that the amendment is a restriction on one's lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently precluded. The problem, therefore, lies not with what the summary says, but, rather, with what it does not say.

14

Id. at 155-56 (footnote omitted). The same cannot be said for Matheson's case now before this Court. The purpose in Askew was to impose an immediate change. The referendum in that case was misleading because it appeared that it was increasing the prohibition, but in actuality, it was lessening the existing prohibition. In the case before us, the "chief purpose" of the referendum was to find out if at least two-thirds of the voters supported what was being asked in the referendum. However, there was no immediate change to anything after the results of the referendum were tallied. The only result was that the public, by an affirmative vote of more than two-thirds of the electorate, approved the proposed development at Crandon Park and the modification of agreements relating thereto. In addition, the ballot here did not try to accomplish the opposite of what the voters were being asked, which is what happened in Askew. As such, Askew is distinguishable and does not support Matheson's position.

Matheson also cites to Armstrong v. Harris, 773 So. 2d 7 (Fla. 2000), in support of his position that the ballot language is misleading by "hiding the ball" and "flying under false colors." However, a review of Armstrong indicates that it, too, is distinguishable and does not support his position.

In Armstrong, a referendum was held wherein voters were asked to vote in favor of amending Florida's Constitution to make it easier to impose the death penalty. Id. at 9-10. If the voters approved the amendment, the basis for imposing

15

the death penalty would have changed immediately. Id. at 18. Just as in Askew, the ballot question in Armstrong was misleading because it concealed what the amendment did. The ballot question was trying to accomplish the opposite of what the voters were being asked. The chief purpose of the referendum in Armstrong was to change Florida's Constitution. As previously discussed, that is not the case before us, so Armstrong is also inapplicable.

Matheson further cites to Wadhams v. Board of County Commissioners of Sarasota County, 567 So. 2d 414 (Fla. 1990). In that case, the Board of County Commissioners of Sarasota County proposed amendments to the county charter concerning meetings of the county's Charter Review Board. Id. at 415. The proposed amendments were approved by a majority of the voters. Id. Petitioners then filed a complaint challenging the amendment to the county charter, contending that the referendum failed to comply with section 101.161(1) because it did not provided a summary of the proposed changes. Id. The trial court did not invalidate the results of the referendum, and the Second District Court of Appeal affirmed, stating that "[t]he fact that a ballot may be confusing to some does not mandate a court to invalidate the results of an otherwise properly conducted election." Id. (citations omitted).

The Florida Supreme Court disagreed and stated that the ballot in Wadhams had the same problem as the ballot in Askew. Wadhams, 567 So. 2d at 416. The

16

Court stated that the "chief purpose" of the referendum was not communicated to

the voters:

> By containing the entire section as it would actually appear subsequent to amendment, rather than a summary of the amendment to the section, the ballot arguably informed the voters that the Charter Review Board would only be permitted to meet once every four years. By failing to contain an *explanatory statement* of the amendment, however, the ballot failed to inform the public that there was presently no restriction on meetings and that the *chief purpose* of the amendment was to curtail the Charter Review Board's right to meet. Similar to the ballot summary at issue in *Askew*, the present ballot "is deceptive, because although it contains an absolutely true statement, it omits to state a material fact necessary in order to make the statement made not misleading." Askew, 421 So.2d at 158 (Ehrlich, J., concurring). The only way a voter would know what changes were being effected by an affirmative vote on the ballot would be to know what section 2.11 of the county charter provided prior to amendment. As then Judge Grimes noted in his dissent below: "[T]here was nothing on the ballot to inform the voter of the change to be accomplished by the amendment, which is the very reason why section 101.161(1) requires an explanatory statement." 501 So.2d at 124 (Grimes, J., dissenting). *See also Kobrin v. Leahy*, 528 So.2d 392 (Fla. 3d DCA)(placement on ballot of proposition to provide that the board of county commissioners shall be the governing board of the fire and rescue service district, but making no mention of the elimination of the existing governing body of the Fire and Rescue District, was misleading to voters and violated section 101.161(1), especially in light of simultaneously conducted election of persons to the existing governing board), *review denied*, 523 So. 2d 577 (Fla. 1988).

Id. at 416-17 (emphasis in original).

17

Again, the ballot question was misleading because it failed to include the explanatory statement required by section 101.161(1), and thus failed to inform the voters of the "chief purpose" of the measure. It told the voters that the Charter Review Board would only be permitted to meet once every four years, but failed to tell them that there was presently no restriction on meetings and that the chief purpose of the amendment was to curtail the Charter Review Board's right to meet. In the facts of Matheson's appeal, the referendum (which was just a few words shy of the seventy-five word maximum requirement) included a reference to R-660-12, which had all the details of the existing structures expansion, as well as the details of the modification and extension of the existing agreements.

Similarly, Matheson's reliance on this Court's opinion in Miami-Dade County v. Village of Pinecrest, 994 So. 2d 456 (Fla. 3d DCA 2008), is misplaced, as this case does not support his position. In Village of Pinecrest, Miami-Dade County presented a ballot question addressing the system by which fire and rescue services are provided to the citizens of Miami-Dade County. The ballot title and summary were the following:

COUNTY CHARTER AMENDMENT **CREATING** UNIFORM COUNTYWIDE FIRE AND RESCUE SERVICE AND PRESERVING EXISTING CITY SERVICE

SHALL THE CHARTER BE AMENDED TO REQUIRE THAT THE BOARD OF COUNTY COMMISSIONERS PROVIDE A UNIFORM, COUNTYWIDE SYSTEM OF FIRE PROTECTION

AND RESCUE SERVICES FOR ALL INCORPORATED AND UNINCORPORATED AREAS OF THE COUNTY WITH THE EXCEPTION OF THE CITIES OF MIAMI, MIAMI BEACH, HIALEAH, CORAL GABLES, AND KEY BISCAYNE WHICH MAY PROVIDE FOR FIRE AND RESCUE PROTECTION SERVICES WITHIN THOSE CITIES?

Id. at 457-58 (emphasis in original). In Village of Pinecrest, the appellees claimed that the ballot title was misleading because it implied there previously did not exist a "uniform countywide fire and rescue service." Id. at 458. The appellees further argued the ballot summary was misleading because it failed to advise voters that it curtailed their right to establish their own system. Id. The provision of the Charter which the appellees claimed the County fatally failed to mention in the ballot summary was the following:

### SECTION 6.02 MUNICIPAL POWERS

Each municipality shall have the authority to exercise all powers relating to its local affairs not inconsistent with this charter. Each municipality may provide for higher standards of zoning, service and regulation than those provided by the Board of County Commissioners in order that its individual character and standards may be preserved for citizens.

Miami-Dade County, Fla., Charter art. 6, § 6.02.

This Court agreed with the Village of Pinecrest, stating:

This proposal does both. It "flies under false colors" of a title that promises to be "Creating [a] Uniform Countywide Fire and Rescue Service" when one has existed in Miami-Dade County for nearly thirty years,

19

> and "hides the ball" by purporting to create new rights for the citizens while actually curtailing or eliminating existing rights.

Id. This is very different from the facts in the case before us. The referendum in the case before us did not fail to mention anything. The referendum here did not allege that it created any new rights for citizens while actually doing the opposite and eliminating existing rights. The referendum at issue before us simply provided voters with detailed information regarding the Crandon Park expansion, consistent with Florida law and Article 7 of Miami-Dade County's Home Rule Charter.

In sum, the referendum did not "hide the ball" or "fly under false colors." Section 101.161, of the Florida Statutes, required that IPC and Miami-Dade County tell the voters, in clear and unambiguous language, the chief purpose of the referendum. And the referendum did just that. The referendum language was clear and unambiguous and not misleading. It informed the voters of its chief purpose, which was to find out whether at least two-thirds of the voters supported 1) the "[e]rection of permanent structures and the expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use, which [would] be funded solely by tennis center and tournament revenues and private funds; and 2) the [m]odification and extension of agreements with the operator of the Sony Open Tennis Tournament or its successors". The referendum did not change in any way the procedure for amending the Crandon Park Master Plan. The

referendum language complied with Article 7 of Miami-Dade County's Home Rule Charter and section 101.161(1), Florida Statutes (2012). Accordingly, we affirm the trial court's Final Judgment.

Affirmed.

EMAS, J., concurs.

EMAS, J., concurring.

I concur in affirming the final judgment below, and write to further explain my reasons.

Although our standard of review is de novo, such review is tempered by the "strong public policy against courts interfering in the democratic processes of elections." Let Miami Beach Decide v. City of Miami Beach, 120 So. 3d 1282 (Fla. 3d DCA 2013) (quoting Fla. League of Cities v. Smith, 607 So. 2d 397, 400 (Fla. 1992)). Therefore, "[a] court may declare a proposed . . . amendment invalid only if the record shows that the proposal is clearly and conclusively defective." O'Connell v. Martin Cnty., 84 So. 3d 463, 465 (Fla. 4th DCA 2012) (quoting Armstrong v. Harris, 773 So. 2d 7, 11 (Fla. 2000)).

I agree that the language of the ballot summary informed the voters of the "chief purpose" of the referendum without "flying under false colors" or "hiding the ball," thus satisfying section 101.161, which requires that "the voter have notice of that which he must decide. . . . What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot." Armstrong, 773 So. 2d at 13 (quoting Askew, 421 So. 2d 151, 154-55 (Fla. 1982)).

Determining the "chief purpose" of the referendum requires us to look to the reason why the ballot question was placed before the voters in the first place. Contrary to Matheson's position, the referendum was not intended to (and in fact could not) modify, alter or amend the previously-created Crandon Park Master Plan, the Declaration of Restrictive Covenants, the Final Judgment or the Settlement Agreement. Rather, the referendum was intended to comply with the requirements of Article 7 of the Charter of Miami-Dade County. Article 7.01 sets forth a policy that states in pertinent part:

> Parks. . . and lands acquired by the Count for preservation shall be held in trust for the education, pleasure, and recreation of the public and they shall be used and maintained in a manner which will leave them unimpaired for the enjoyment of future generations as a part of the public's irreplaceable heritage.

Article 7.02 provides restrictions for the use of public parks and requires a majority vote of the electorate before certain commercial uses may be made. It provides the following general restriction:

> In furtherance of this policy parks shall be used for public park purposes only, and subject to the limited exceptions set forth in this Article, there shall be no permanent structures or private commercial advertising erected in a public park or private commercial use of a public park or renewals, expansions, or extension of existing leases, licenses, or concessions to private parties of public park property, unless each such structure, lease, license, renewal, expansion, extension, concession or use shall be approved by a majority vote of the voters in a County-wide referendum.

23

In addition, Article 7.02 creates a special class of public parks (which includes Crandon Park), and imposes the heightened requirement of a two-thirds vote of the electorate before certain commercial uses may be made for this class of parks:

> To ensure aquatic preserves, lands acquired by the County for preservation, and public parks or parts thereof which are nature preserves, beaches, natural forest areas, historic or archeological areas, or otherwise possess unique natural values in their present state, such as. . . <u>Crandon Park</u>, . . . and all other natural or historical resource based parks do not lose their natural or historical values, <u>any structure, lease, license, renewal, extension, concession or use in any of this class of public parks or in aquatic preserves and preservation lands must be approved by an affirmative vote of two-thirds of the voters</u> in a County-wide referendum. (Emphasis added.)

Given this backdrop, it is clear that the "chief purpose" of the referendum was to comply with the Charter's requirement that two-thirds of Miami-Dade voters approve any proposed expansion of the facilities in Crandon Park. The chief purpose of the referendum was decidedly <u>not</u> to determine whether Miami-Dade voters wished to amend the Crandon Park Master Plan, the Declaration of Restrictive Covenants, the Final Judgment, or the Settlement Agreement. In point of fact, no vote of Miami-Dade citizens would or could have effectuated any such amendments; under the express terms of the Settlement Agreement, the only

24

manner in which the Crandon Park Master Plan could be amended was by a majority vote of the Miami-Dade County Board of Commissioners, together with a majority vote of the Committee on Amendment of the Crandon Park Master Plan. This amendment process did not require any vote of the electorate. Therefore, under the circumstances presented, the "chief purpose" of the vote was simply a mandated referendum to determine whether two-thirds of the Miami-Dade County electorate wished to permit the proposed expansion of the facilities.

Matheson's reliance on Askew and Armstrong is misplaced. Each of those cases involved a vote which, in and of itself, effectuated a change to the existing provisions of the state constitution. In Armstrong, the ballot summary misled the voters because it created the impression that the proposed amendatory language would provide greater constitutional protection when in reality it accomplished the opposite:

> [A] citizen could well have voted in favor of the proposed amendment thinking that he or she was protecting state constitutional rights when in fact the citizen was doing the exact opposite- i.e., he or she was voting to nullify those rights.

Armstrong, 773 So. 2d at 18.

Similarly, Askew involved a proposed amendment which purported to strengthen Florida's constitutional restrictions on lobbying activities. However,

25

the actual effect of the proposed amendment was to weaken the existing constitutional provision:

> As it stands, [the existing constitutional provision] precludes lobbying a former body or agency for two years after an affected person leaves office. The ballot summary neglects to advise the public that there is presently a complete two-year ban on lobbying before one's agency and, while it does require the filing of financial disclosure before anyone may appear before any agency for the two years after leaving office, the amendment's chief effect is to abolish the present two-year total prohibition. Although the summary indicates that the amendment is a restriction on one's lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently precluded. The problem, therefore, lies not with what the summary says, but, rather, with what it does not say.

Askew, 421 So. 2d at 155-56 (footnote omitted).

The distinction between Askew and the instant case is underscored by the following observation in Askew:

> Had [the ballot proposal] not been an amendment to an existing provision, if it had been a totally new provision, its ballot summary and title would probably have been permissible. The change to subsection 8(e) [of Article II of the Constitution] is as stated, but the stated change is only incidental to the true purpose and meaning of section 8 in its entirety. Public financial disclosure is needed to assure the accountability of state officers and is the heart of section 8. But, in subsection (e), section 8 also expresses another vital concern-the ban on lobbying. The ballot summary fails to give fair notice of an exception to a present prohibition.

26

Id. at 156.

Matheson attempts to portray the referendum in the instant case as an amendment to the Crandon Park Master Plan. But it is not. Unlike the referenda in Armstrong and Askew, passage of this referendum did not amend, modify or alter anything. It is the legal equivalent of "a totally new provision" as described in Askew. And unlike the summaries in Armstrong and Askew, no material ramifications were left undisclosed in the instant case, nor did the ballot language fail to apprise the voters of the "full sweep" of the proposal. Rather, it adequately informed the voters of the sweep, effect, and ramification of the referendum. The electorate's approval of the referendum did not impact the Crandon Park Master Plan, and did not, on its own, permit the County or any private entity to erect permanent structures, expand existing structures, or extend or modify agreements with the operator of the tennis tournament. It was certainly not necessary to advise voters that no such expansion could take place without an amendment to the Crandon Park Master Plan. The fact that the terms of the Crandon Plan Master Plan currently prohibited such expansion was not material, as the voters were not asked to amend the Crandon Park Master Plan.

In the instant case, because the referendum did not effectuate any change beyond complying with the Charter-mandated procedure for approving "any structure, lease, license, renewal, extension, concession or use" in the class of

27

public parks that included Crandon Park, it satisfied the requirement that it place "the voter on notice of that which he must decide" and "advise the voter sufficiently to enable him intelligently to cast his ballot," Armstrong, 773 So. 2d at 13.

I therefore concur in affirming the judgment of the trial court.

Bruce Matheson v. Miami-Dade County, Florida, a Political Subdivision of the State of Florida, and International Players Championship, Inc., 3D14-405

WELLS, Judge (dissenting).

I respectfully dissent. Because I find that the ballot summary misled the voters and failed to disclose material information necessary for the public to make an informed decision under section 101.161 of the Florida Statutes (2012), I would reverse.

### 1. Underlying Facts

Twice before, this court has considered a dispute between members of the Matheson Family and the County over the erection of structures at the Crandon Park Tennis Center and IPC's operation of a tennis tournament at that center. See Dade Cnty. v. Matheson, 605 So. 2d 469 (Fla. 3d DCA 1992); White v. Metro. Dade Cnty., 563 So. 2d 117 (Fla. 3d DCA 1990). The underlying facts leading to the instant dispute between Bruce Matheson, the County and IPC are largely set forth in our initial decision in White:

In 1940, several members of the Matheson family deeded three tracts of land located on the northern portion of Key Biscayne to Dade County. This land, consisting of 680 acres, came to be known as Crandon Park. In the recorded deeds, the grantors expressly provided:

> This conveyance is made upon the express condition that the lands hereby conveyed shall be perpetually used and maintained for public park purposes only; and in case the use of said land for park purposes shall be abandoned, then and in that event the said [grantor], his heirs, grantees or assigns, shall be entitled upon their request to have the said lands reconveyed to them.

> . . . .

In 1986, the Dade County Board of County Commissioners passed Resolution R-891-86, which authorized the execution of an agreement with Arvida International Championships, Inc., (Arvida), and the International Players Championship, Inc., (IPC), to construct a permanent tennis complex. The construction of the court facilities and infrastructure began in the summer of 1986, and terminated in 1987. Initially, the tennis complex consisted of fifteen tennis courts, service roads, utilities, and landscaping, all located on 28 acres.

The agreement provided that for two weeks each year, subject to a renewal provision, the tennis complex would become the site of the Lipton International Players Championship Tennis Tournament (Lipton tournament). This renowned tournament is only open to world class players who compete for two weeks.

In February 1987, the first Lipton tournament was held before approximately 213,000 people. The county manager considered the Lipton tournament to be such a tremendous success that he recommended, and the County Commission approved in Resolution R-827-87, the construction of "Phase II," a permanent clubhouse/fitness facility. This 15,000-to-33,000-square-foot facility was to house locker rooms, training and exercise equipment, meeting rooms, food and beverage concessions, and a sporting goods store. As a result of "community input," the clubhouse was ultimately reduced

to 9,800 square feet. This "community input" consisted of informal meetings with residents and one public hearing.

During the four Lipton tournaments held thus far on Key Biscayne, temporary seating has been provided. Appellants contend that a 12,000-seat permanent stadium is part of the future development plans.

. . . .

In 1987 and again in 1988, Dade County attempted to obtain the consent of one of the heirs, Hardy Matheson, for the operation of the Lipton tournament. Hardy Matheson refused to give his consent, and informed the County that the tennis complex and the operation of the Lipton tournament was contrary to the deed restriction.

White, 563 So. 2d at 121-22.

In White, we held that while "the construction of the tennis park complex did not violate the 'public park purposes only' provision of the deed restriction," operation of the tournament did violate the restriction because it "deprive[d] the public of the use and enjoyment of Crandon Park, including the use and enjoyment of the tennis facilities." Id. at 123-24. The basis for the violation was that operation of the tournament, as it was at that time, amounted to the "virtual ouster of the public from the park for periods of time during the two week tournament." Id. at 125. As we explained:

Our ruling does not prevent Dade County from using the tennis complex for tennis tournaments. It merely seeks to insure that in holding such tournaments, public access to the rest of Crandon Park is not infringed; and use of the tennis complex is not denied to the public for unreasonable periods of time.

30

Id. at 126.

In 1991, Matheson heirs filed a second lawsuit specifically directed at the construction of a permanent 7,500-seat stadium at the tennis complex, claiming that the stadium construction violated the deed restriction on the subject property. The trial court agreed with the Mathesons and entered a permanent injunction prohibiting the construction. We reversed, finding that our resolution of the first lawsuit in White had already addressed whether construction of a stadium as part of the proposed tennis complex violated the terms of the Matheson deed restriction and concluded that it did not. See Matheson, 605 So. 2d at 470. We also noted that although the second lawsuit did not raise any arguments that the tennis tournament as it was then being run still amounted to a "virtual ouster" of the public from Crandon Park in violation of the deed restriction, anyone with proper standing to raise that issue "would have the right to go back before the original trial court, [which] has jurisdiction over this matter, to seek the appropriate relief or enforcement, be it of a[n] equitable nature or otherwise." Id. at 471. Encouraged by this statement, the Mathesons filed an Emergency Motion for Supplemental and Additional Relief and to Amend Final Judgment in the first (the White) proceeding.

On January 14, 1993, while this motion was pending, the Matheson Family and the County entered into a Settlement Agreement to "amicably resolve once and

for all time, the appropriate park uses to which the County may put Tracts 1, 2 and 3 of the Crandon Park lands and the locations of such uses within the Crandon Parks lands." To this end, the Settlement Agreement called for the creation of a Crandon Park Master Plan, drafted by experts, subjected to public scrutiny, and implemented by a "Declaration of Restrictions" recorded in the public records to run with the land:

> (a) **Creation.** The Parties agree that a Crandon Park Master Plan shall be prepared by the professional park planning Olmsted Firm . . . depicting all permitted uses of various areas on the Crandon Park lands . . . . *It is the Parties' intention that the Crandon Park Master Plan* created pursuant to this Settlement Agreement, and implemented through the Declaration of Restrictions hereinafter described, *shall determine for all time (subject to amendment as herein after provided) the uses of, and improvements upon, and their location within, the Crandon Park lands*.

> (b) **Consultation With The Parties; Draft Plan; Final Plan; Amendment.** In creating the Crandon Park Master Plan, the Olmsted Firm shall consult with the County and its designated Park professionals, and with the Matheson Family, and their designated representatives. In addition the Olmsted Firm shall consult with the County's professional tennis tournament operators concerning the use of the "Tennis Center" at Crandon Park . . . for the operation of the International Players Championship . . . . The Olmsted Firm shall submit a draft of the Crandon Park Master Plan . . . to the Parties, and the County shall hold a public hearing [there]on . . . .

(Emphasis added).

This agreement, among other things, expressly provided that the Crandon Park Master Plan was to "be consistent with all of the terms of this Settlement

Agreement," and that no new or additional permanent structures would be erected

at the Tennis Center:

> **No New Permanent Structures on the Tennis Center . . . .** Except as provided above with respect to the [then contemplated] permanent tennis stadium, the Tennis Center shall include only such permanent structures as are presently located on the Tennis Center. . . .

The Settlement Agreement also provided that the Master Plan, as

implemented by a Declaration of Restrictions that was to be recorded in the public

records of Miami-Dade County and made part of the final judgment in White,

would be subject to change or amendment only upon approval by both the County

Commission **_and_** a Committee on Amendment of the Crandon Park Master Plan:

> The Crandon Park Master Plan as implemented by the above mentioned Declaration of Restrictions and Final Judgment, may be amended following adoption only by the following procedure: (1) the County by affirmative vote of the County Board of Commissioners shall propose an amendment through action by resolution; (2) the County shall appoint two persons to a Committee on Amendment of the Crandon Park Master Plan, and the National Parks and Conservation Association (or a successor non-profit park preservation organization mutually agreed upon by the Parties) shall likewise appoint two members to such Committee on Amendment of the Crandon Park Master Plan. The Committee shall consider the proposed amendment to the proposed Crandon Park Master Plan and an affirmative vote of no less than three members of such Committee shall be required to amend the Crandon Park Master Plan, which amendment shall be incorporated by the County in an amendment to the Declaration of Restrictions implementing the Crandon Park Master Plan. Should a proposed amendment to the Crandon Park Master Plan fail to receive an affirmative vote of at least three members of such Committee on the Amendment of the Crandon Park Master Plan, the proposed amendment shall fail and the Crandon Park Master Plan shall be enforced as previously in force.

As contemplated by the Settlement Agreement, a Crandon Park Master Plan was drafted and approved by the Matheson Family and the County. That 102-page plan and its 24 appendices delineate detailed objectives for all areas comprising Crandon Park.[3] Among other things, this plan expressly precludes construction of virtually any additional permanent structures within Crandon Park:

> Except as expressly provided in this Master Plan, there shall be no new structures, improvements, features, or major modifications to existing structures or improvements (defined as renovations or repairs constituting more than 50% of the value of the existing structure or improvement), whether temporary or permanent, located or constructed on the Crandon Park Lands, provided that resurfacing of any tennis court in excess of 50% of the value of the court shall be permitted.

With regard to the Tennis Center, described in the Master Plan as comprising a tennis stadium, a clubhouse, and 27 tennis courts, no new permanent structures or expansion whatsoever was authorized:

> **No New Permanent Structures on the Tennis Center** . . . Except as provided . . . with respect to the permanent tennis stadium, the Tennis Center shall include only such permanent structures as are presently located on the Tennis Center and depicted in the Master Plan Site Plan.

---

[3] The areas specifically addressed were Crandon Boulevard, the Crandon Park Marina, the ibis preserve, the Crandon Park Golf Course, the Crandon Park Tennis Center, the West Point Preserve, the Fire Station, the Calusa Mangrove Trail and Archaeological sites, the Crandon Park Service Area, the Crandon Park Zoo and Gardens, the Crandon Park Cabanas, the Parking and Beach Drive, the Crandon Park Beach, the Crandon Park Visitors and Nature Center, and the Bear Cut Preserve.

Significantly, the Master Plan provides that any amendments either to it or to the contemplated Declaration of Restrictive Covenants memorializing it "shall be adopted sparingly, in conformity with [the Master Plan's] Statement of Intent and consistent with the provisions of the Settlement Agreement reached on January 14, 1993 by and between the Matheson family and Dade County."[4]

On August 25, 2000, as required by the Settlement Agreement between the Matheson Family and the County, a Declaration of Restrictive Covenants was recorded in the public records of Miami-Dade County. That Declaration confirmed that consistent with the Settlement Agreement and the Crandon Park Master Plan: (1) it was the intention of the County and the Matheson Family for all time to restrict the use of and improvements to Crandon Park by limiting those uses and improvements to those authorized by the Crandon Park Master Plan; (2) that under the Master Plan no structures or improvements other than those then contemplated or existing and described in the Master Plan were to be made at Crandon Park unless authorized by the Declaration which incorporated the terms of the Master Plan and Settlement Agreement; (3) that the Declaration with its incorporated Settlement Agreement and Master Plan were to run with the land; and

---

[4] The Declaration of Restrictive Covenants similarly provides that any modification or amendment of the Declaration itself must be made in accordance with the provisions of the Master Plan, and that any modification or amendment of the Master Plan may be made "only in accordance with the provisions contained in the Settlement Agreement dated January 14, 1993 . . . ."

(4) the Declaration was not subject to modification except as provided by the Settlement Agreement and Master Plan—that is, with the approval of ***both*** the County Commission and the Committee on Amendment of the Crandon Park Master Plan:

> **WHEREAS**, in order to fulfill the requirements of the Settlement Agreement [between the County and the Matheson Family] and forever to resolve the disputes and litigation between [them], the County [as owner of Crandon Park] has agreed to restrict the uses of and the improvements upon Crandon Park as provided in this Declaration, subject to modification or amendment only in accordance with the provisions contained herein;
>
> . . . .
>
> **1. CRANDON PARK MASTER PLAN.** Upon the recordation of this Declaration, the [Crandon Park] Property shall be restricted to those uses and improvements set forth in the Crandon Park Master Plan attached hereto . . . subject to modification or amendment only in accordance with the provisions contained therein. It is the intention of the County and the Matheson family that the Crandon Park Master Plan, which has been created pursuant to the Settlement Agreement and implemented through this Declaration, shall determine for all time (subject to modification or amendment only as herein provided) the uses of, and improvements upon, and their location within, the [Crandon Park] Property. No structure, improvement or other facility, whether permanent or temporary, shall be located or constructed upon the [Crandon Park] Property unless provided by the terms of this Declaration.
>
> **2. BINDING EFFECT OF DECLARATION.** This Declaration shall constitute a covenant running with the land, and shall be binding upon the County, upon it successors and assigns, and upon all parties having any right, title or interest in [the Crandon Park] Property. This Declaration shall be recorded in the public records of Miami-Dade County, Florida, and shall remain in full force and effect

until such time as the Declaration is modified or amended in accordance with the terms contained herein.

. . . .

**4.  MODIFICATION AND AMENDMENT.**  This Declaration may be modified or amended only in accordance with the provisions contained in the Settlement Agreement dated January 14, 1993, which appears as Appendix F to the Crandon Park Master Plan . . . and upon compliance with the terms of such Settlement Agreement as to amendment of the Crandon Park Master Plan, by a written instrument duly recorded in the public records of Miami-Dade County.

Finally, on October 18, 2000, pursuant to the terms of the Settlement Agreement, the trial court in <u>White</u> entered an Amended Final Judgment approving and incorporating the Crandon Park Master Plan and ordering the parties to comply with the provisions of that plan and the Declaration of Restrictive Covenants.

*2. The Instant Matter*

On August 23, 2012, the County's Board of County Commissioners passed Resolution R-660-12, authorizing the following question to be placed on the November 2012 ballot:

**Referendum Regarding Structures and Modifications of Existing Agreements for the Tennis Center at Crandon Park**

In accordance with Article 7 of the Home Rule Charter, do you approve as set forth in Resolution R-660-12:

- Erection of permanent structures and expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use, which shall be funded solely by tennis center and tournament revenues and private funds; and

37

- Modification and extension of agreements with operator of Sony Open Tennis Tournament or its successors.

Attached to the resolution was a detailed proposal for additional permanent structures to be constructed at the tennis complex, including: numerous new permanent additions to the current stadium; three new permanent courts with spectator grandstands; a lake cottage; and open pavilions. Also attached to the resolution were the proposed terms for the extension and modification of existing agreements between the County and IPC, pursuant to which IPC operates an annual tennis tournament at the Tennis Center. Therein, IPC proposed a new operating agreement to replace the existing agreement, to fund the development of the additional permanent structures at the tennis complex, and to be allowed to lease office space within the current stadium for year round use.

Although no agreement from the Committee on Amendment of the Crandon Park Master Plan to amend the Master Plan or to modify the Declaration or the Settlement Agreement to allow the proposed additional structures or use of the park was secured, the referendum approved by the County Commission was placed on the November 6, 2012 ballot and approved by the voters of Miami-Dade County.

A month after the election, Bruce Matheson filed the instant action against the County seeking to invalidate the referendum on three grounds: first, he claimed

that the ballot title and summary of the referendum failed to comply with section 101.161 of the Florida Statutes (count I); second, he claimed that the ballot title and summary of the referendum violated article 7 of the County's Home Rule Charter (count II); and third, he claimed that the County's misstatements and concealments with respect to the referendum and Resolution R-660-12 violated paragraph A(2) of the Citizens' Bill of Rights in the County's Home Rule Charter (count III). IPC was allowed to intervene in the action.

While this matter was pending, the County finalized an agreement with IPC which it claims are within the parameters delineated in Resolution R-660-12. The Board of County Commissioners conditionally approved that agreement.

In August 2013, Matheson moved for entry of final summary judgment. As to count I, he argued that the ballot title and summary of the referendum violated the accuracy requirements of section 101.161 of the Florida Statutes by failing to inform the electorate of the existence of the Settlement Agreement and Amended Final Judgment in the White litigation, as well as the Crandon Park Master Plan and the Declaration of Restrictive Covenants, all of which operate to restrict future expansion of the tennis complex subject to the Master Plan being amended as set forth in the Settlement Agreement. As to count II, he argued that the ballot title and summary of the referendum violated article 7 of the County's Home Rule Charter by asking the voters to endorse what were then non-binding proposals for

39

the expansion of the tennis complex and to approve agreements between the County and IPC that had yet to be negotiated. Matheson made no arguments in his motion with respect to count III.

The County opposed the motion and also moved for summary judgment on Matheson's claims. As to count I, the County argued that section 101.161 was not violated because the required amendment of the Master Plan by three of four voters on the Committee on Amendment of the Crandon Park Master Plan was "the needle in the proverbial haystack of development approvals required to accomplish the Tennis Center project," therefore, it was not necessary to mention anything specifically with respect thereto either in the ballot question or in the resolution referenced therein. The County also argued that the ballot title and summary were sufficiently specific to put the voters on notice of the chief purpose of the referendum. As to count II, the County argued that the referendum did not violate Article 7 of the Home Rule Charter because it was not required to present the voters with fully negotiated, final deals prior to the issues being put on the ballot. IPC filed its own cross-motion for summary judgment, arguing that summary judgment should be granted on Matheson's claims for many of the same reasons argued by the County.

After holding a hearing on the parties' motions, the trial court entered an order granting final summary judgment in favor of the County and IPC as to counts

I and II, finding the "'chief purpose' of the referendum was properly provided to the voters by the title and ballot summary," and as to count III because Matheson had made no argument as to it. This appeal ensued.

### 3. Legal Analysis

The standard of review of the instant final summary judgment is *de novo*. See Miami-Dade Cnty. v. Vill. of Pinecrest, 994 So. 2d 456, 457 (Fla. 3d DCA 2008) (applying a *de novo* standard of review in determining whether a local referendum complied with the accuracy requirements of section 101.161 of the Florida Statutes).

Florida law requires that every ballot initiative placed before the public for a vote must be accompanied by a short title and a summary which clearly and unambiguously state the primary purpose of the ballot initiative:

> Whenever a . . . public measure is submitted to the vote of the people, a ballot summary of such . . . public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates . . . . The ballot summary of the . . . public measure shall be an explanatory statement, not exceeding 75 words in length, of the ***chief purpose*** of the measure. . . . The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.

§ 101.161(1), Fla. Stat (2012) (emphasis supplied); Askew v. Firestone, 421 So. 2d 151, 155-56 (Fla. 1982) (confirming that section 101.161 applies to "all ballots"); see also Wadhams v. Bd. of Cnty. Comm'rs of Sarasota Cnty., 567 So. 2d 414, 416

41

(Fla. 1990) (applying section 101.161 to a county ballot initiative to amend a county charter).

The purpose of these requirements "is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment" so that the electorate is not misled but is put on "fair notice of the decision [it] must make." Askew, 421 So. 2d at 155-156; see also Wadhams, 567 So. 2d at 416. This means not just that a ballot title and summary must faithfully track the text of a proposed initiative, but that they may not "fly under false colors" or "hide the ball" by failing to disclose the initiative's true effect. Armstrong v. Harris, 773 So. 2d 7, 16 (Fla. 2000).

In Askew, for example, the Florida Legislature by joint resolution proposed an amendment to Section 8 of Article II of the Florida Constitution relating to lobbying by former legislators and statewide elected officials. That proposal would have removed an absolute two-year ban on lobbying by former legislators and statewide elected officials who filed financial disclosures. Askew, 421 So. 2d at 155. While the title to the proposed amendment and its summary accurately disclosed that former legislators and statewide elected officials who failed to file financial disclosures would be precluded from lobbying activities for two years, it was struck down for failure to disclose that the proposal would repeal the existing, more stringent post-term prohibition on lobbying:

> As it stands, subsection 8(e) precludes lobbying a former body or agency for two years after an affected person leaves office. The ballot

42

summary neglects to advise the public that there is presently a complete two-year ban on lobbying before one's agency and, while it does require the filing of financial disclosure before anyone may appear before *any* agency for the two years after leaving office, the amendment's chief effect is to abolish the present two-year total prohibition. Although the summary indicates that the amendment is a restriction on one's lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently prohibited. ***The problem, therefore, lies not with what the summary says, but, rather, with what it does not say***.

. . . .

If the legislature feels that the present prohibition against appearing before one's former colleagues is wrong, it is appropriate for that body to pass a joint resolution and to ask the citizens to modify that prohibition. But such a change must stand on its own merits and not be disguised as something else. The purpose of section 101.161 is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment. ***A proposed amendment cannot fly under false colors***; this one does.

Id. at 155-56 (some emphasis added) (footnote omitted); see also Wadhams, 567 So. 2d at 416 (invalidating a vote approving an amendment to a county charter because although the amendment's title and summary accurately tracked the amendment's language which provided that the County's Charter Review Board would only be permitted to meet once every four years, the ballot failed to explain that currently there was no restriction on meetings—thus, making the chief purpose of the amendment to curtail the Board's right to meet).

In Armstrong, the Florida Supreme Court struck a ballot initiative because, much like in Wadhams, the ballot was defective "for what it d[id] ***not*** say." Armstrong, 773 So. 2d at 21. There, the Court first found a ballot title and summary "flew under false colors" because the ballot misleadingly implied that by amending article I, section 17 of the Florida Constitution to prohibit imposition of "cruel ***and*** unusual punishment" rather than "cruel ***or*** unusual punishment," the rights of Florida citizens would be enhanced or promoted through the rulings of the United States Supreme Court:

> Use of the word "or" instead of "and" in [article 1, section 17] indicates that the framers intended that both alternatives (i.e., "cruel" and "unusual") were to be embraced individually and disjunctively within the Clause's proscription.

> This Court in Traylor v. State, 596 So. 2d 957 (Fla. 1992), explained that our system of constitutional government in Florida is grounded on a principle of "robust individualism" and that our state constitutional rights thus provide greater freedom from government intrusion into the lives of the citizens than do their federal counterparts . . . . In short: "[T]he federal Constitution . . . represents the floor for basic freedoms; the state constitution, the ceiling." Id.

> In the present case, by changing the wording of the Cruel or Unusual Punishment Clause to become "Cruel *and* Unusual" and by requiring that our state Clause be interpreted in conformity with its federal counterpart, the proposed amendment effectively strikes the state Clause from the constitutional scheme. Under such a scenario, the organic law governing either cruel or unusual punishments in Florida would consist of a floor . . . and nothing more. . . .

> In the present case, a citizen could well have voted in favor of the proposed amendment thinking that he or she was protecting state

44

constitutional rights when in fact the citizen was doing *the exact opposite*—i.e., he or she was voting to nullify those rights.

Armstrong, 773 So. 2d at 17-18 (footnote omitted).

The Armstrong Court then concluded that the ballot summary also "hid the ball" by failing to accurately state the chief purpose or main effect of the proposed amendment, that is, to nullify the Cruel or Unusual Punishment Clause of Florida's constitution:

> To conform to section 101.106(1), a ballot summary must state "the chief purpose" of the proposed amendment. In evaluating an amendment's chief purpose, a court must look not to subjective criterial espoused by the amendment's sponsor but to objective criteria inherent in the amendment itself, such as the amendment's main effect. In the present case, as explained above, the main effect of the amendment is simple, clear-cut, and beyond dispute: The amendment will nullify the Cruel or Unusual Punishment Clause. This effect far outstrips the stated purpose (i.e., to "preserve" the death penalty), for the amendment will nullify a longstanding constitutional provision that applies to *all* criminal punishments, not just the death penalty. Nowhere in the summary, however, is this effect mentioned—or even hinted at. The main effect of the amendment is *not* stated anywhere on the ballot. (The voter is not even told on the ballot that the word "or" in the Cruel or Unusual Punishment Clause will be changed to "and"—a significant change by itself.)

Id. at 18 (footnotes omitted); see also Village of Pinecrest, 994 So. 2d at 458 (invalidating a ballot initiative amending Miami-Dade County's Home Rule Charter because its title flew under false colors by promising to create a uniform county wide fire and rescue service when one had long existed and hid the ball by purporting to create new rights while actually curtailing or eliminating them).

Here, as in Askew and Armstrong, the ballot summary both "fl[ies] under false colors" and "hide[s] the ball." While the ballot summary suggests that the electorate is being asked to "approve" the "[e]rection of permanent structures and expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use" and "modifications and extension of agreements" with IPC, in reality it is nothing more than a conditional or non-binding straw ballot with no binding official effect. Compare City of Miami v. Staats, 919 So. 2d 485, 486-87 (Fla. 3d DCA 2005) (finding a City of Miami ballot question which clearly stated that it was a "Straw Ballot" and asked "Shall the voters of Miami-Dade elect the Tax Assessor instead of the County Manager of Miami-Dade County appointing the Tax Assessor," flew under false colors and hid the ball because the ballot title and summary failed "to adequately inform the voting public that their response ha[d] no official effect, i.e., that the ballot question [was] simply a nonbinding opinion poll"), with City of Hialeah v. Delgado, 963 So. 2d 754, 757 (Fla. 3d DCA 2007) (finding that a straw ballot which asked "Would you support a voter petition" to resolve the same issue addressed in Staats complied with section 101.161(1) because the ballot language adequately informed the voters that the ballot measure had no binding effect).

The ballot summary also "hid[] the ball" by failing to mention or disclose that approval of the proposed changes were conditioned on the agreement of a third

46

party, the Committee on Amendment to the Crandon Park Master Plan. That is, the summary failed to inform the voters that the changes proposed by the resolution for which approval was sought could not be made by virtue of a "yes" vote on the referendum. See Armstrong, 773 So. 2d at 21 (finding a ballot question hid the ball from the voters where the "ballot title and summary give no hint of the radical change in state constitutional law that the text actually foments"); Askew, 421 So. 2d at 156 (striking a resolution that proposed a constitutional amendment because the ballot summary was "misleading to the public concerning material changes to an existing constitutional provision").

The County takes exception to the view that it hid the ball, suggesting that Resolution R-660-12 which is referred to in the ballot summary adequately addresses these matters. It points to exhibit B to the resolution wherein IPC proposed "that it would undertake to seek the receipt of all required *development approvals* to ensure that all the Additional Permanent Structures comply with all legal obligations." (Emphasis supplied). The County suggests that the amendment of the Master Plan "is just one of many development approvals that [IPC] will need to obtain in order to upgrade the existing, and construct new, facilities at" the tennis complex, comparing it to a laundry list of development approvals it must obtain before the proposed expansion may occur, from the U.S. Army Corps of

47

Engineers to the South Florida Water Management District. Not only is the County's argument misleading, it is also wrong.

The subject Master Plan prohibition on the erection of permanent structures at Crandon Park is a unique condition that only applies to this public park, is the result of a Settlement Agreement reached after years of litigation, and is memorialized in the public record in a Declaration of Restrictive Covenants that runs with the land—none of which are even mentioned in the resolution. The Master Plan amendment process is hardly the equivalent of the routine approvals that must be secured before making an improvement on public land. Moreover, to increase or expand the structures currently located at the Tennis Center would require more than just a modification of the Crandon Park Master Plan. It would also entail invalidating the Settlement Agreement and Declaration of Restrictive Covenants, and modifying a long since final judgment—none of which are simply routine development approvals. In any event, reference to "development approvals" in an exhibit to the subject resolution is not sufficiently clear and unambiguous to inform the voters of the unique circumstances that exist as to expansion of the tennis complex at Crandon Park or to the conditions that must be met before any expansion may occur.

This all could have been avoided simply by advising voters that the approvals being sought were conditioned on approval by a third party, all of which

easily could have been accomplished in seventy five words as required by section 101.161:

> In accordance with Home Rule Charter Article 7, and subject to Crandon Park Master Plan Amendment Committee approval, do you approve as Resolution R-660-12 provides:
>
> - Erection of permanent structures and expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use, to be funded solely by tennis center and tournament revenues and private funds; and
>
> - Modification and extension of agreements with operator of Sony Open Tennis Tournament or its successors.

In finding that the ballot summary fails to comply with section 101.161(1), I do not disagree with the County's contention that Article 7 of the County's Home Rule Charter requires that voters also approve of the proposed expansion of the tennis complex and modification/extension of agreements with IPC in a County-wide referendum. However, if the voters are being asked to approve the changes that the County wished to make, they must be made aware of the fact that the County's desires and their approval of them are conditional or will not effectuate the proposed changes.

Finally, IPC questions the validity of the Settlement Agreement in the White proceeding, suggesting that the Master Plan amendment process was an unlawful delegation of legislative authority by the Board of County Commissioners. However, IPC abandoned this argument at the summary judgment hearing below,

49

agreeing that this question would be resolved in separate litigation pending in the circuit court. A substantial portion of IPC's Answer Brief on this appeal is dedicated to this very issue, which IPC candidly admits is not now properly before us in this appeal. Indeed, after spending some twenty pages providing the factual background for and discussing the "unlawful delegation" issue, IPC concedes "[t]hat issue can only be solved in [the trial] court, such as in IPC v. Matheson, which may later reach this Court." Needless to say, this particular issue need not be addressed in this appeal.

### 4. Conclusion

Because the ballot summary misled the voters as to the true legal effect of the referendum and failed to disclose material information necessary for the public to make an informed decision under section 101.161, I would find that the ballot is defective and that the post-election results of the subject referendum must be invalidated. I would therefore reverse the order granting final summary judgment in favor of the County and IPC and remand with instructions that final summary judgment be granted in favor of Matheson.